UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 1:17-cr-10172-DJC-1 |
| KEON SMITH | |

## KEON SMITH'S SENTENCING MEMORANDUM

For distributing an amount of crack cocaine weighing less than a paperclip[1] to a fellow addict, the United States charged Keon Smith with violating federal controlled substances law. Armed with Mr. Smith's admission to the offense and the United States Sentencing Guidelines provision for "career offenders," the government seeks to incarcerate Mr. Smith for 15-20 years. The crime of conviction does not merit a punishment of incarceration and for the reasons set-forth below, Mr. Smith asks that the Court fashion a sentence that focuses on mental health and addiction treatment during a substantial period of supervised release after a (non-career offender) guideline sentence of 21-months imprisonment. The government thoroughly recites the collateral impact of drug use in the Orchard Park housing projects, but the reality is that Mr. Smith is neither the cause of the problem nor is his incarceration the solution. In fact, Mr. Smith is the tragic consequence of the social harms the government laments,

---

[1] The total weight of the distributed drugs, including packaging for 4 of 5 baggies, was .67 grams. A paperclip often weighs more. *See* https://en.wikipedia.org/wiki/Talk%3AGram.

and by fashioning a sentence that contributes to Mr. Smith's personal redemption, this

Court can send a clear message to him and others that there is hope.

### The Life of Keon Smith

The gravamen of the government's sentencing memorandum is that drug crime

begets other crime and social ills, and that the Orchard Park Housing Project has long

suffered. That is all true. But Mr. Smith is a product, not a cause, of the social condition

the government reports. As set-forth more fully in the attached report of Dr. Julia

Reade, Mr. Smith's life story has many hallmarks of a person destined for addiction and

mental health issues. If imposed, the six-years of supervised release will mark the first

time that treatment and personal improvement programs have ever been available to

Mr. Smith.

Mr. Smith's history of depression and self-doubt dates back to his childhood.

(Exhibit A-Dr. Reade Eval. at 8.) Mr. Smith was raised in the Orchard Park Housing

Projects. (*See* Exhibit A-Dr. Reade Eval. at 2.) He was raised by his mother, who was

supportive and hard working. Mr. Smith's father left when he was just six years old.

Mr. Smith was emotional following his parents' separation, as he had been close to his

father. Much of Mr. Smith's childhood was spilt between the two homes. (*See* Exhibit B-

Letter from Linda Smith.) His early childhood was also riddled with observations of

violence. By the time he reached his teens, several of his friends had been shot and

killed, including his best friend Antione. (*See* Exhibit A-Dr. Reade Eval. at 3.) He and his

family were literally and figuratively caught in the crossfire of gang violence, and he

had no alternative but to join a gang for safety. (*See* Exhibit A-Dr. Reade Eval. at 3.) As

Dr. Reade carefully chronicled in her evaluation, this period of time was marked by helplessness, depression, and the beginning of his drug use. (Exhibit A-Dr. Reade Eval. at 8.) When Mr. Smith was 15, he briefly went to live with his father, but returned after he became upset with his father for not enrolling him in high school. Mr. Smith's mother notes this as a time of change in Mr. Smith. Because his mother could only get an apartment in the Orchard Gardens Projects, Mr. Smith's new school and friends marked an even more difficult time for him. (*See* Exhibit B-Letter from Linda Smith.) Eventually, Mr. Smith was indifferent to his education because he envisioned no future for himself—and the race riots in 1993 at his South Boston High School further alienated him from his education.[2] (*See* Exhibit A-Dr. Reade Eval. at 3–4.)

In 1999, Mr. Smith shot and killed his uncle; he pleaded guilty to manslaughter. (*See* Exhibit A-Dr. Reade Eval. at 6, PSR ¶ 11.) His ten-year incarceration exacerbated his prior mental health issues. During the time that he was incarcerated, Mr. Smith was sent to MCI Bridgewater to be evaluated. He was diagnosed with Major Depressive Disorder and received antidepressant medication. (*See* Exhibit A-Dr. Reade Eval. at 6, PSR ¶ 65.) However, after just three months, Mr. Smith was transferred out of Bridgewater, and stopped taking the medication. (Exhibit A-Dr. Reade Eval. at 6.) Mr. Smith did not want to return to Bridgewater, and there were no other mental health offerings in the ordinary correctional setting to assist him with his mental health issues. Mr. Smith did, however, seek to be moved to a lower security facility, but was repeatedly denied. (*See* Exhibit A-Dr. Reade Eval. at 6–7.) Mr. Smith also repeatedly

---

[2] See generally https://www.nytimes.com/1993/05/07/us/school-in-boston-is-shut-for-week-after-race-fight.html.

requested and applied to participate in the Department of Corrections drug rehabilitation program, but was similarly denied on each occasion. (Exhibit A-Dr. Reade Eval. at 7.) Mr. Smith's mental health struggles with his uncle's death continue to the present. Mr. Smith continues to have depressed mood, panic attacks, feelings of impending doom, chest pains, difficulty breathing, and butterflies in his stomach. (*See* Exhibit A-Dr. Reade Eval. at 8.)

Because of these ongoing mental health issues—stemming from a young age and exacerbated through his incarceration—, Mr. Smith had severe symptoms of mental health needs but no resources to treat them when he was released. Soon he began to treat his depression with alcohol and drugs. (*See* Exhibit A-Dr. Reade Eval. at 7–8, PSR ¶65, 70-76.) In 2014, police stopped and frisked Mr. Smith after they saw him loitering in a park one evening. They found crack cocaine and charged him with possession with intent to distribute cocaine in a park, which carried a mandatory two-year sentence of imprisonment. His court-appointed attorney filed no substantive motions, sought no programs, and soon Mr. Smith pled guilty to possession with intent to distribute and the Commonwealth of Massachusetts dismissed the 'school zone' enhancement, allowing for a sentence of probation. That sentence included no provision for drug testing and no condition for stabilization or treatment. (*See* PSR ¶ 43.)

Neither of these experiences with the criminal-justice system offered Mr. Smith any relief from his suffering. Mr. Smith's pleas for mental health treatment while incarcerated were ignored. His probation for a drug crime in Roxbury included no conditions related to his addiction. To be clear, Mr. Smith has only been charged with

two crimes prior to the instant charge, and neither incarceration for a long-period nor probation contributed the resources needed to effectuate his rehabilitation.

On September 28, 2016, Mr. Smith attempted to enroll at Roxbury Community College. (*See* Exhibit C-Roxbury Community College Test Results; *see also* Exhibit A-Dr. Reade Eval. at 11.) This effort speaks volumes about Mr. Smith's desire to improve his life. It should tell this Court that he continues to have ambition, and with the proper tools, will be rehabilitated. Mr. Smith also worked during the period after his release from prison and continued to work until his arrest in this matter. (*See* PSR ¶ 80-83, Exhibit D-Sample Paystubs.)

Despite Mr. Smith's mental health and substance abuse challenges, he has family members that depend on him and are hopeful for his release. (*See* Exhibit B-Letter from Shaki Hall; Letter from Shawnte Hall; Letter from Linda Smith; Letter from Rose Smith; Letter from Sandra Smith; and Letter from Tanisha Smith.) Mr. Smith began seeing his girlfriend, Shawnte Hall, about eight years ago; they have a two-year-old son. After they met, Mr. Smith took on the role of stepfather to Ms. Hall's daughter, and the family moved to New Bedford. This was a happy time for the family. Mr. Smith was working and helping support the family; he treated Ms. Hall's daughter like his own. (*See* Letter from Shawnte Hall.) Mr. Smith has an adult daughter (from a prior relationship), Quiana, who has a two-year-old son. The father of Quiana's son has been shot and killed. (Exhibit A-Dr. Reade Eval. at 4–5, 13.) While the family was in New Bedford, Quiana and Ms. Hall's daughter became sisters. The family was complete. (*See* Exhibit B-Letter from Shawnte Hall; *see also* Letter from Tanisha Smith.) Mr. Smith's

stepdaughter has relied on him for help with school, and sees him as a big part of her family. (*See* Exhibit B-Letter from Shaki Hall.) After Ms. Hall became pregnant with their son, the family moved back to Boston in 2013. Mr. Smith is the only male figure in his young son's life. (*See* Letter from Shawnte Hall.) Mr. Smith worries about his family and is interested in programs and treatment that will help him move forward. (*See* Exhibit A-Dr. Reade Eval. at 11–12.)

## A Sufficient Sentence

"Sentences recommended by the career offender guideline are among the most severe and least likely to promote sentencing purposes in the United States Sentencing Guidelines Manual." *United States v. Barr*, 132 F.Supp.3d 290, 295 n.7 (D.R.I. 2015) (McConnell, J.) (quoting Amy Baron–Evans et. al., *Deconstructing the Career Offender Guideline*, 2 Charlotte L.Rev. 39, 40–42 (2010)). "Neither the severity of the guideline nor its breadth is the product of careful study, empirical research, or national experience." *Id.* The guideline has therefore been "widely criticized." *United States v. Whigham*, 754 F. Supp. 2d 239, 241 (D. Mass. 2010) (Gertner, J.).

Not surprisingly, sentencing courts frequently eschew a strict application of the career offender guideline. From 2005 through 2014, a large majority of career offender defendants received departures. During that time, the percentage of career offenders sentenced within the guideline range dropped from 43.3 percent to 27.5 percent. *Report to the Congress: Career Offender Sentencing* Enhancements, U.S. Sent. Commission,

August 2016, at 22. This trend is very much alive in the District of Massachusetts, as

noted by Judge William Young:

> [I]t is my impression that my colleagues and I depart or vary downward
> from the career offender guideline to a greater degree than any other
> guideline . . . I am prepared to accept that the draconian sentences
> mandated by the career offender guideline have been largely discredited
> in Massachusetts."

*United States v. Jones*, 762 F. Supp. 2d 270, 284 (D.Mass. 2010).

A strict application of USSG §4B1.1 would be excessive in this case and would

fall well within the class of draconian sentences to which Judge Young referred. Absent

that guideline, Mr. Smith's advisory range would be 15-21 months.[3] Here, because of

the career offender guideline he faces a range of 188 to 235 months. For the reasons set

forth below, neither the crime of conviction nor Mr. Smith's criminal history merit such

a radically enhanced punishment, and a sentence of 15 months with six-years of

supervised release is sufficient and not longer than necessary to achieve the purposes of

sentencing.

### The §3553(a) Factors

Pursuant to 18 U.S.C. §3553(a)(2), the Court must consider the need for the

sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the

law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and

---

[3] The defendant's offense level without career offender enhancement is 14. (PSR ¶ 29, 34.) He would be eligible for two points for acceptance of responsibility under §3E1.1(a), resulting in a total offense level of 12. (*See* PSR ¶ 36.) His base offense is so low that he cannot benefit from the additional 1-point reduction for prompt acceptance of responsibility. Absent Career Offender Adjustments, his Criminal History Category would be III, the resulting range would be 15-21 months.

(D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the nature and circumstances of the defendant, the kinds of sentences available, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### Nature and circumstances of the offense

The nature and circumstances of Mr. Smith's admitted crime is distributing a fraction of a gram of crack cocaine to a fellow addict for $80.00. The crime itself, in isolation, would hardly justify the massive amount of resources dedicated to its detection. The United States, however, seeks to lay at Mr. Smith's feet the societal failures found in and around the Orchard Park community. Any reference to the impact of crimes and violence on the quality of life in that community misses the point that Mr. Smith is the product of those social ills. Neither has he substantially contributed to the problems, nor would his imprisonment ameliorate them.

Two years of investigation, surveillance, controlled buys and undercover activities of several law enforcement agencies yielded a single controlled buy from Mr. Smith. He was not a significant factor in the drug trade in that community.

### Deterrence

As this Court contemplates deterrence, both specific and general, it must consider that long sentences have not rehabilitated or deterred Mr. Smith from drug use or dealing. Drug use and dealing go hand-in-hand and can only be resolved through treatment of Mr. Smith's addiction and mental health issues. A long period of

incarceration will simply warehouse Mr. Smith and deprive him of full access to treatment for his mental health and addictions issues.

To the extent this Court must fashion a sentence to discourage others from committing the same crime as Mr. Smith, the Court must recognize two realities. First, drug user–dealers are not rational actors, and thus no rational deterrent will control their decision-making process. Second, the war on drugs has a long history of substantial sentences with very little history of curbing drug use or dealing.[4] From the 1990s and continuing until the arrests in this matter, state and local law enforcement have been arresting large groups of alleged wrongdoers en masse from the Orchard Park Development.[5]

Mr. Smith is precisely the type of low-level drug dealer for whom the career offender guideline is unduly harsh. Where the underlying conduct is low-level drug distribution, rigid sentencing does little to protect the public or promote general deterrence, a fact acknowledged by the United States Sentencing Commission:

> [C]riminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level

---

[4] *See* https://www.cato.org/publications/policy-analysis/four-decades-counting-continued-failure-war-drugs; *see also* https://www.nytimes.com/2017/12/31/opinion/failed-war-on-drugs.html, and the current cases before the court: https://www.justice.gov/usao-ma/pr/twelve-charged-selling-drugs-and-around-orchard-gardens-housing-development-boston.

[5] *See* Boston Globe Article about 17 arrests made in 1994: http://archive.boston.com/news/local/massachusetts/articles/2004/06/24/raid_hits_24_hour_drug_ring?pg=full); *see also* https://www.prnewswire.com/news-releases/16-members-of-the-orchard-park-trailblazers-face-federal-and-state-drug-charges-announces-us-attorney-75107792.html.

drug seller prevents little, if any, drug selling; the crime is simply committed by someone else.

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 134 (2004).

A sentence that addresses Mr. Smith's addiction and mental health issues will utilize the six-years of supervised release productively. By contrast, a decade or more in prison is unnecessary—and after a certain point, counterproductive—to address these issues. *See United States v. Barrows*, 11-CR-10188-RWZ, Dkt. 39 (D. Mass. Feb. 21, 2012) (Zobel, J.) (substantial departure from career offender guideline appropriate, in part,

because defendant had "alcohol and drug and mental health issues, none of which, will likely yield to imprisonment of 13+ years").

As discussed by Dr. Reade, Mr. Smith's depression and addiction are treatable. A long-term regime of treatment and supervision is necessary to address the root causes of his criminal conduct and to achieve thereby the mandate of §3553(a).

The Court must also seek to avoid disparate sentencing where practicable. As a result of this investigation, the United States charged 12 individuals with distribution offenses. Although four judges were involved, the sentences have largely been similar.

| NAME/CRM | NO. | GSR | CRIM | GOV'T | SENTENCE |
|---|---|---|---|---|---|
| Daiquan Lucas 17-10173-WGY | 1 | 10-16 | 0 (CHC I) | Year and a day | Year and a day |
| Kevin Woods 17-10176-MLW | 1 | 15-21 | 5 (CHC III) prior fed | 21 months | 21 months, 6 years supervised release |
| Lyndon Scott 17-10179-PBS | 1 (1 Attempted) | 15-21 | 6 (CHC III) | 21 months | 15 months, 6 years supervised release |
| Jeremiah Mines 17-10180-LTS | 5 | 10-16 | 1 (CHC I) | 14 months | Year and a day, 6 years supervised release |
| Andre Parham Rankin 17-10181-IT | 1 plus guns and marijuana | 37-46 | 9 (CHC II) | 36 months | 36 months |
| Dominique Dozier 17-10182-ADB | 1 | 188-235 | 18 (CHC VI) | 188 months | 50 months, 6 years supervised release |
| Jaylin Hawkins 17-10178-PBS | 5 | 18-24 | 5 (CHC III) | 18 months | Year and a day, 6 years supervised release |
| Raul Williams 17-10174-RWZ | 1 | 21-27 | 6 (CHC IV) | 21 months | 21 months, 6 years supervised release |
| Raymond Gaines 17-10177-ADB | 2 | 12-18 | 2 (CHC II) | Year and a day | Year and a day |
| Tyree Draughn 17-10230-DPW | 2 | 18-24 | 4 (CHC III) | 21 months | 18 months, 6 years supervised release |

Based upon the information above, the average sentence for a co-defendant in this matter is 20.9 months. Dominique Dozier, also a 'career offender' accused of a single distribution, was sentenced by Judge Burroughs to 50 months. Importantly, Mr. Dozier had a much higher criminal history score (when excluding the Career Offender adjustment) and would have been a Criminal History Category VI regardless of the

enhancement.[6] Mr. Smith, by contrast, has only two prior convictions and would be Criminal History Category III absent his Career Offender status.

## Conclusion

Mr. Smith should not join a long line of drug defendants warehoused in the federal prison system for a non-violent, street-level drug transaction. Instead, like his co-defendants, he should be incarcerated for a reasonable period of time and provided a mandate supported by resources to treat his mental health and addiction issues. For that reason, he asks this Court to sentence him to 21 months of imprisonment and six years of supervised release.

<div style="margin-left:40%">

Respectfully Submitted,
KEON SMITH
By and through counsel

</div>

Date: May 16, 2018

<div style="margin-left:40%">

*/s/ Leonard E. Milligan III*
Leonard E. Milligan III
BBO #668836
MILLIGAN RONA DURAN & KING LLC
50 CONGRESS STREET, SUITE 600
BOSTON, MA 02109
t. 617.395.9493
lem@mrdklaw.com

</div>

---

[6] Mr. Dozier's guideline range without the Career Offender status would have been 30-37 months. Mr. Smith's advisory range would be 15-21 months.